WO                                                                                    JDN

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Kristoffer Larsgard,<br><br>                    Plaintiff,<br><br>vs.<br><br>Corizon Health, Inc.<br><br>                    Defendant. | No.   CV 13-01747-PHX-SPL (JFM)<br><br><br>**ORDER** |

Plaintiff John Kristoffer Larsgard, through counsel, brought this civil rights Complaint under 42 U.S.C. § 1983 against Defendant Corizon Health Incorporated (Corizon), a private corporation contracted to provide medical services for the Arizona Department of Corrections (ADC) (Doc. 1).  Before the Court is Corizon's Motion for Summary Judgment (Doc. 32).

The Court will deny the motion and direct Corizon to file a new summary judgment motion.

## I.     Background

In his Complaint, Larsgard set forth two counts for relief: a medical-care claim under the Eighth Amendment (Count I) and a gross negligence/negligence claim under state law (Count II) (Doc. 1 ¶¶ 36-56).  Larsgard alleged that when he entered the ADC in April 2012, he had a pre-existing spinal condition that caused chronic, severe pain, muscle spasms, and seizures (*id.* ¶ 14).  He claimed that in December 2012, he suffered a seizure, fell out of bed, and injured his neck and spine (*id.* ¶¶ 14-15).  The fall caused

further nerve damage and left him partially paralyzed, and shortly thereafter, he underwent emergency surgery on his neck and spine (*id.* ¶¶ 15-17, 19).  According to Larsgard, following surgery, the treating neurosurgeon, Dr. Ali A. Baaj, recommended that Larsgard see a pain-management specialist for his chronic, severe pain and receive follow-up treatment within 30 days, including MRI/CT scans, so that a neurologist could evaluate whether his spine was properly healing and the bolts in his neck and spine remained in place (*id.* ¶ 20).  Larsgard alleged that despite these recommendations, he was not returned for follow up until late July 2013, six months later, and at that time, the x-rays and MRI imagings had not yet been taken (*id.* ¶ 21).

Larsgard averred that as of the date of his Complaint (August 23, 2013), he had not seen a pain management specialist for his chronic, severe pain (*id.* ¶ 22).  He further averred that his medication is ineffective and inadequate to control his seizures, muscle spasms, and neuropathic pain, and the medication that is provided is routinely out of supply or discontinued for non-medical reasons (*id.*).

Larsgard seeks injunctive and declaratory relief for the alleged Eighth Amendment violation ((*id.* ¶¶ 40-46).  Specifically, he requests an injunction against Corizon to (1) perform the requisite imaging studies of his neck and spine; (2) refer him to a pain management specialist; and (3) timely administer his medications (Doc. 39 at 2).  Larsgard also seeks compensatory and punitive damages and costs (Doc. 1 ¶¶ 57-60).

Corizon moves for summary judgment only on the Eighth Amendment claim (*see* Doc. 32).  It argues that (1) there is no evidence it denied adequate medical care or had the culpable state of mind required for deliberate indifference and (2) Larsgard merely presents a difference of opinion regarding treatment (Doc. 32).

In his opposition, Larsgard concedes that Corizon has performed the requisite imagings; therefore, that particular request for injunctive relief is moot (Doc. 39 at 2).

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).  Where the plaintiff seeks injunctive relief, the court may also consider developments that postdate the motions to determine whether an injunction is warranted. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

**III.   Relevant Disputed and Undisputed Facts**

In 2009, Larsgard underwent posterior cervical fusion surgery in Germany (Doc. 33, Def.'s Statement of Facts (DSOF ¶ 2); Doc. 40, Pl.'s Controverting Statement of

Facts (PCSF) ¶ 2).  In December 2012, while in ADC custody, Larsgard fainted in his cell and hit the back of his head, which caused upper extremity paresthesia and neck pain (DSOF ¶ 3; PCSF ¶ 3).  This pain was exacerbated on January 1, 2013, when Larsgard turned his head and lost consciousness (*id.*).  He was taken to the emergency room and later admitted to the University of Arizona Medical Center, where x-rays revealed a C6 fracture (Doc. 40, Pl.'s Statement of Facts (PSOF) ¶ 1 & Ex. 1 (Doc. 40-1 at 5)[1]).[2] Larsgard underwent a posterior cervical fusion and laminectomy performed by Dr. Ali Baaj (DSOF ¶ 3; PCSF ¶ 3).  Thereafter, on January 11, 2013, Larsgard was transferred to a rehabilitation facility, and Dr. Baaj prescribed a list of medications, which included narcotics and benzodiazepines (DSOF ¶ 4; PCSF ¶ 4).[3]  Upon Larsgard's discharge, Dr. Baaj recommended he return for follow up 3 weeks after surgery, and a typical follow up is usually 2-3 weeks after surgery, then again at 3 months, and then at 6 months (PCSF ¶ 8).[4]

Larsgard received pain management treatment post-surgery at the Medical Center and the rehabilitation facility; however, the parties dispute whether this pain management treatment was with a specialist (PSOF ¶ 2; Doc. 42 ¶ 2).  Dr. Baaj has recommended pain management treatment since the surgery (PSOF ¶ 2; Doc. 42 at 2).

---

[1] Additional citation refers to the document and page number in the Court's Case Management/Electronic Case Filing system.

[2] Corizon objects to parts of PSOF ¶ 1 and some of the Exhibits cited in support of PSOF ¶ 1; however, there are no objections to the assertion that Larsgard suffered a fractured cervical spine or to Exhibit 1 (Doc. 42 at 1).

[3] The list of prescribed medications included the following: Tramadol, Salsalate, Phenytoin, Nortriptyline, Neurontin (also known as Gabapentin), Clonazepam, Citalopram, Senna, Bisacodyle, Docusate, morphine tablets and Dilaudid tablets for pain, and Robaxin and Soma for muscle spasms (DSOF ¶ 4; PCSF ¶ 4).

[4] Corizon objects to PCSF ¶ 8 on the grounds that PCSF ¶ 8 does not really dispute DSOF ¶ 8, it is actually a separate statement of fact, it contains improper arguments, and it does not include citation to the record for some arguments (Doc. 42 ¶ 5).  The objection is overruled.  PCSF ¶ 8 disputes an impression presented in DSOF ¶ 8 regarding Larsgard's follow up, and the asserted facts are supported by the cited medical record (*see* Doc. 40, Ex. 9 at 9, 11-12 (Doc. 40-9 at 9-12)).

On February 11, 2013, after Larsgard's return to prison, prison physician Dr. Kevin Lewis noted that in addition to the MS Contin (morphine) prescribed by Dr. Baaj for post-surgical pain, Larsgard had a history of taking a high dose of opioids from 2009 (DSOF ¶ 6; PCSF ¶ 6).  Prior to his incarceration, Larsgard was treated by a physician in Norway for chronic, severe neck pain (PSOF ¶ 3).[5]  The Norwegian physician tried alternative treatments and pain medications but determined that a combination of opioids and benzodiazepines was the only effective treatment for Larsgard's severe pain (*id.*).

On March 4, 2013, Corizon assumed care and treatment of Larsgard when it replaced Wexford as the contracted entity with the State of Arizona to provide healthcare services to inmates (Doc. 32 at 4 n. 1).

Corizon states that Dr. Lewis attempted to wean Larsgard off of the high dose opioid analgesics and, in an April 2013 medical note, documented that Larsgard "is highly resistant to wean off opioid analgesics.  My goal is gradual wean to lowest dose to maintain function" (DSOF ¶ 7).  Larsgard states that Dr. Lewis advised him that Corizon ordered Dr. Lewis to discontinue morphine pain medication per its policy (PCSF ¶ 7).[6]

---

[5] Corizon objects to PSOF ¶ 3 because it is supported by the declaration of Dr. Stokke, Larsgard's former treating physician in Norway; Corizon asserts that this declaration is improper, lacks foundation, and was not previously disclosed (Doc. 42 ¶ 3). There is nothing in Rule 56 suggesting that affidavits used to oppose summary judgment must have been previously disclosed, and Corizon provides no legal authority to support that at summary judgment, Larsgard is limited to evidence disclosed during discovery. *See* Fed. R. Civ. P. 56(c)(1)(A) and (4).  Further, Dr. Stokke's declaration establishes personal knowledge and provides background regarding Larsgard's condition.  *See* Fed. R. Civ. P. 56(c)(4).  The objection is overruled.

[6] Corizon objects to PCSF ¶ 7 on the grounds that the assertions therein rely on Larsgard's declaration and "the declaration is disputed as it repeatedly makes statements without foundation and which contain hearsay" (Doc. 42 ¶ 4).  Larsgard's statements satisfy the requirements of Rule 56(c)(4) (declaration must be made on personal knowledge and set out facts that would be admissible in evidence).  Also, Corizon's objection that the declaration "repeatedly makes statements" lacking foundation and containing hearsay is too general.  The Court will only consider specific objections to identified paragraphs within the declaration. *See Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule").  For these reasons, Corizon's objection is overruled.

Larsgard states that his pain medication regularly "ran out," which caused him to suffer severe bouts of pain (*id.*).

Larsgard was not seen by Dr. Baaj for follow up until July 26, 2013 (DSOF ¶ 8; PCSF ¶ 8).  At this appointment, Dr. Baaj noted that Larsgard had no post-op x-rays so he ordered that an x-ray and imagings "be performed immediately" and that a disk with the results be mailed to the hospital neurosurgery clinic (*id.*).   He also ordered that Larsgard follow up with the neurosurgery clinic in 6 months for a cervical spine CT (DSOF ¶ 8).

On August 20, 2013, Larsgard saw prison Nurse Practitioner Richard Unger (DSOF ¶ 9).  The medical record from this encounter reflects that the two discussed pain management and that Larsgard stated he felt his pain was under control with morphine sulfate (MS Contin) but he requested diazepam (Valium) for muscle spasms (Doc. 33, Ex. L (Doc. 33-1 at 23)).  Larsgard was already on diazepam, but Unger increased the dosage and also submitted a consult request for a CT of the cervical spine in 6 months per Dr. Baaj's request (*id.*; PCSF ¶ 9).  Thereafter, a "Utilization Management" physician reviewed Larsgard's medication history, determined that his medication combination with diazepam was a dangerous combination, and ordered that the dosage be reduced to prevent any adverse reaction (Doc. 40, Ex. 10 (Doc. 40-10 at 1)).

Defendant states that on August 22, 2013, x-rays were ordered for Larsgard's cervical spine, as requested by Dr. Baaj (DSOF ¶ 10).

On September 11, 2013, Larsgard met with Dr. Dimitri Catsaros at the prison; Dr. Catsaros ordered that the MS Contin (morphine) be continued (DSOF ¶ 11; PCSF ¶ 11).

On October 18, 2013, an MRI and CT of the cervical and thoracic spine were performed (DSOF ¶ 12; PCSF ¶ 12).  The results, received on December 3, 2013, stated that the hospital chose not to perform the x-rays; that the CT scan showed a healed and aligned cervical spine and an unremarkable thoracic spine; and that metal placements in the spine created distortion and prevented an accurate MRI reading (DSOF ¶ 12).

1    On November 26, 2013, a neurological consult was ordered; the consult request

2    was approved on December 5, 2013 by the Medical Director (DSOF ¶ 13).

3    On March 10, 2014, pursuant to the consult request, Larsgard saw Dr. Baaj, and

4    Larsgard reported that his pain symptoms had improved (*id.*; PCSF ¶ 13).  Dr. Baaj

5    determined Larsgard had full range of motion of the neck without pain and "shows good

6    alignment"; he noted that the C6/7 fracture had healed; he recommended pain

7    management; and he noted that no further follow up was needed (DSOF ¶ 13 (in part) &

8    Doc. 33, Ex. Q (Doc. 33-1 at 37)).

9    On March 18, 2014, Larsgard reported that he suffered a seizure and complained

10   of neck pain; he was transferred to the University of Arizona Medical Center emergency

11   facility (DSOF ¶ 14; PCSF ¶ 14).  New CT scans were taken of Larsgard's head and

12   neck, and all findings were negative for abnormalities (*id.*).

13   On March 27, 2014, Larsgard was transferred to the ADC Yuma facility (DSOF

14   ¶ 15; PCSF ¶ 15).

15   On April 3, 2014, Larsgard saw Dr. Elijah Jordan at the prison (DSOF ¶ 16; PCSF

16   ¶ 16 (in part)).  Dr. Jordan advised Larsgard that it was time to wean off of the narcotic

17   medications and replace them with non-narcotic medication; Larsgard was apprehensive

18   to changes because his medications were at a comfortable level, although he also

19   complained of neck pain (*id.*).  Dr. Jordan ordered a tapering down of MS Contin over a

20   period of 4 weeks and started prescriptions for Effexor and Baclofen, which act as muscle

21   relaxants (DSOF ¶ 17).[7]

22

23   [7] In PCSF ¶ 16, Larsgard asserts that Effexor is known to induce seizures, and asks the Court to take judicial notice of a website, "PDRhealth" at www.pdrhealth

24   .com/drugs/effexor, and the information provided therein about Effexor. Corizon objects generally to PCSF ¶ 16; however, it is not clear whether it objects to this specific

25   statement and website citation (Doc. 42 ¶ 11). Nonetheless, the Court will not consider the asserted fact because there is no statement or affidavit from a physician to support

26   that Effexor was contraindicated for Larsgard due to the risk of seizures or any of the other risks listed.  *See In re Homestore.com., Inc. v. Sec. Litig.*, 347 F. Supp. 2d 769, 782

27   (C.D. Cal. 2004) (finding print outs from a web site inadmissible at summary judgment because they were not properly authenticated by an affidavit from someone with

28   knowledge); *see also Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir. 2002) ("arguments and statements of counsel are not evidence")

1    On April 10, 2014, Larsgard saw Dr. Jordan again, at which time Larsgard
2  reported that he did not feel well and he had suffered fainting episodes, and he had
3  vomited after taking his medications (DSOF ¶ 18; PCSF ¶ 18).  Dr. Jordan discontinued
4  Effexor and replaced it with Depakote (DSOF ¶ 18).  A couple days later, Dr. Jordan also
5  prescribed Pamelor (DSOF ¶ 19).  On April 16, 2014, a nurse notified Dr. Jordan that
6  Larsgard refused his daily dosage of Depakote due to intolerance of the medication;
7  therefore, Dr. Jordan continued tapering down the narcotics and discontinued Depakote
8  and replaced it with Alph Lipoic Acid—a non-narcotic medication (*id.*).  Dr. Jordan also
9  prepared a consult request for a physician for pain management (*id.*).

10    On May 7, 2014, Larsgard again saw Dr. Jordan; Larsgard complained of pain,
11  discomfort, and hypoglycemic symptoms (DSOF ¶ 20).  The medical note from this
12  appointment reflects that Dr. Jordan planned to prescribe Lyrica (Doc. 42, Ex. 2).  The
13  Lyrica prescription was submitted and, shortly thereafter, Dr. Jordan received the
14  alternative recommendation of an equivalent medication, Neurontin (also known as
15  Gabapentin) (Doc. 47 ¶2).  On May 21, 2014, Dr. Jordan prescribed
16  Neurontin/Gabapentin, a non-narcotic medication, as a replacement pain medication in
17  lieu of Lyrica (*id.*; PCSF ¶ 19).

18    Meanwhile, on May 15, 2014, the request for an off-site consultation for pain
19  management was approved (DSOF ¶ 22).

20    On May 21, 2014, Larsgard complained of an increased heart rate and appeared to
21  have possible tachycardia issues, so the Pamelor prescription was immediately
22  discontinued (DSOF ¶ 21).  But Larsgard was administered Pamelor for two more days
23  (PCSF ¶ 21).

24    On May 23, 2014, Larsgard began receiving the Neurontin/Gabapentin; however,
25  it provided no relief (Doc. 40, Ex. 8, Larsgard Decl. ¶ 20 (Doc. 40-8 at 4)).

26    On June 3, 2014, pursuant to the off-site consultation request, Dr. Kevin S. Ladin,
27  a physician board certified in pain medicine and physical medicine and rehabilitation,
28  (internal quotation omitted).

examined Larsgard (Doc. 40, Ex. 7, Ladin Decl. ¶¶ 1-2 (Doc. 40-7 at 1)).   In his subsequent report, Dr. Ladin stated that Larsgard has suffered significant nerve damage and has incomplete spinal cord injury, resulting in a legitimate pain syndrome (*id.*, Ex. 6 at 6 (Doc. 40-6 at 6)).   Dr. Ladin recommended that Larsgard receive treatment for chronic pain management consistent with the underlying pathophysiology of his pain, including a combination of a neuropathic analgesic medication like Neurontin combined with an antidepressant like Cymbalta (*id.*).   He further stated that topical analgesics like Baclofen can be utilized as a muscle relaxant (*id.*).   Dr. Laden recommended against the use of opioid or benzodiazepine medications because they have not been shown to be beneficial in neuropathic pain syndrome and have a high risk of dependency and addiction (*id.*).   Dr. Ladin also opined that it is medically necessary for Larsgard to be treated by a pain management specialist with experience in spinal cord care and physical medicine (*id.*, Ex. 7, Ladin Decl. ¶¶ 3-4 (Doc. 40-7 at 1-2)).[8]

In early June 2014, a prescription for Cymbalta was written; however, for reasons unknown, Larsgard did not receive this medication (Doc. 43 ¶ 4; Doc. 47 ¶ 4).   Dr. Jordan has prescribed an equivalent medication, Prozac, which Larsgard is currently taking (Doc. 47 ¶ 4).

On July 9, 2014, Baclofen was discontinued (Doc. 43 ¶ 1; Doc. 47 ¶ 1).   Corizon states that it was discontinued at Larsgard's request (Doc. 47 ¶ 1).   Larsgard disputes that he ever requested to be taken off Baclofen as it was the only muscle spasm pain relief he was taking (Doc. 48 ¶ 2).

//

//

---

[8] In its reply, Corizon argues that Dr. Ladin's declaration is deficient because it was not timely disclosed, it is improper as an expert opinion, and it is without foundation (Doc. 41 at 3-4).  To the extent Corizon objects to Dr. Ladin's declaration, the objection is overruled.  The declaration satisfies Rule 56(c)(4), and prior disclosure of a declaration used to oppose summary judgment is not required.  *See* n. 5.  Also, Corizon is incorrect that it is not clear whether Dr. Ladin is referring to Larsgard's past or present treatment needs; his recommendations include no use of the past tense and are clearly referring to present treatment needs (Doc. 40-7 at 1-2).

1  **IV.    Discussion**

2          As mentioned, Corizon is a private entity contracted with the State to provide

3  medical services to prisoners (*see* Doc. 33 at 3 n. 1).  To support a § 1983 claim against a

4  private entity performing a traditional public function, such as providing medical care to

5  prisoners, a plaintiff must allege facts to support that his constitutional rights were

6  violated as a result of a policy, decision, or custom promulgated or endorsed by the

7  private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012);

8  *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).  A private entity is not liable simply

9  because it employed individuals who allegedly violated a plaintiff's constitutional rights.

10 *See Tsao*, 698 F.3d at 1139.  Therefore, Corizon can only be held liable under § 1983 for

11 its employees' civil rights deprivations if Larsgard can show that an official policy or

12 custom caused the constitutional violation.  *See George v. Sonoma Cnty. Sheriff's Dep't*,

13 732 F. Supp. 2d 922 (N.D.Cal. 2010) (inmate's survivors filed a § 1983 action for

14 inadequate medical care, and court found that a private corporation could not be held

15 liable for plaintiffs' injuries because they could not show that the violations occurred as a

16 result of a policy, decision, or custom promulgated or endorsed by the private entity).

17         To maintain a claim against Corizon as an entity, Larsgard must meet the test

18 articulated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *see Tsao*, 698

19 F.3d at 1139 (applying *Monell* to private entities).  The requisite elements of a § 1983

20 claim against a private entity performing a state function are: (1) the plaintiff was

21 deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or

22 custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4)

23 the policy or custom was the moving force behind the constitutional violation.  *Mabe v.*

24 *San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

25 The limitations to liability established in *Monell* apply even where the plaintiff seeks only

26 prospective relief and not money damages.  *L.A. Cnty., Cal. v. Humphries*, 562 U.S. 29,

27 131 S. Ct. 447, 450-51 (2010).

28

1

      **A.**     **Constitutional Deprivation**

2

        **1.**     **Governing Standard**

3         Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate

4   indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

5   2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the

6   deliberate-indifference analysis: an objective standard and a subjective standard.  First, a

7   prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).

8   A "'serious' medical need exists if the failure to treat a prisoner's condition could result

9   in further significant injury or the 'unnecessary and wanton infliction of pain.'"

10  *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds,

11  *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal

12  citation omitted).  Examples of indications that a prisoner has a serious medical need

13  include "[t]he existence of an injury that a reasonable doctor or patient would find

14  important and worthy of comment or treatment; the presence of a medical condition that

15  significantly affects an individual's daily activities; or the existence of chronic and

16  substantial pain." *McGuckin*, 974 F.2d at 1059-60.

17        Second, a prisoner must show that the defendant's response to that need was

18  deliberately indifferent.  *Jett*, 439 F.3d at 1096.   An official acts with deliberate

19  indifference if he "knows of and disregards an excessive risk to inmate health or safety;

20  the official must both be aware of facts from which the inference could be drawn that a

21  substantial risk of serious harm exists, and he must also draw the inference." *Farmer*,

22  511 U.S. at 837.  "Prison officials are deliberately indifferent to a prisoner's serious

23  medical needs when they deny, delay, or intentionally interfere with medical treatment,"

24  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation

25  marks omitted), or when they fail to respond to a prisoner's pain or possible medical

26  need.  *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited; an

27  inadvertent failure to provide adequate medical care or negligence in diagnosing or

28  treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v.*

1  *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).   Further, a mere
2  difference in medical opinion does not establish deliberate indifference.   *Jackson v.*
3  *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

4        Where the plaintiff seeks injunctive relief to prevent a substantial risk of serious
5  injury from becoming actual harm, the deliberate indifference determination is based on
6  the defendant's current conduct.   *Farmer*, 511 U.S. at 845.   Thus, to survive summary
7  judgment, the plaintiff "must come forward with evidence from which it can be inferred
8  that the defendant-officials were at the time suit was filed, and are at the time of summary
9  judgment, knowingly and unreasonably disregarding an objectively intolerable risk of
10  harm, and that they will continue to do so[.]" *Id.* at 846.

11        Even if deliberate indifference is shown, to support an Eighth Amendment claim,
12  the prisoner must demonstrate harm caused by the indifference.   *Jett*, 439 F.3d at 1096;
13  *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical
14  treatment does not constitute Eighth Amendment violation unless delay was harmful).
15  And to support a preliminary injunction for specific medical treatment, the plaintiff must
16  demonstrate ongoing harm or the present threat of irreparable injury.   *See Conn. v. Mass.*,
17  282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or
18  presently threatened injuries"); *see Caribbean Marine Serv. Co., Inc. v. Baldrige*, 844
19  F.2d 668, 674 (9th Cir. 1988).

20                          **2.      Deliberate Indifference**

21        Corizon makes no argument that Larsgard's condition does not constitute a serious
22  medical need (*see* Doc. 32).   Indeed, the record reflects that Larsgard's condition causes
23  him chronic and severe pain and that medical personnel found his condition worthy of
24  attention and treatment.   *See McGuckin*, 974 F.2d at 1059-60.   The analysis therefore
25  turns on whether the response to Larsgard's serious medical need was deliberately
26  indifferent; specifically, whether the failure to provide pain management treatment with a
27  specialist and whether the changes to and discontinuation of certain medications amounts
28  to deliberate indifference.

Refusing to follow the advice of a treating specialist may evidence deliberate indifference.  *See Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), overruled in part on other grounds, *Peralta v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs).  In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n. 10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

### a. Post-Surgery Treatment

The Court first addresses Larsgard's past treatment and whether it constituted deliberately indifferent care.  The undisputed facts show that in January 2013, Larsgard underwent emergency surgery on his spine (Doc. 33, DSOF ¶ 3); the surgeon, Dr. Baaj, directed that Larsgard should return for follow up within 3 weeks after surgery (Doc. 31, Ex. 1 (Doc. 13-1 at 3)); yet, Larsgard was not taken for his first follow up appointment until July 26, 2013—more than six months later and more than four months after Corizon assumed care for Larsgard (Doc. 33, DSOF ¶ 8).  In addition, x-rays that Dr. Baaj specifically requested be performed before the July 26 follow up appointment were not done (Doc. 40, Ex. 9 at 5 (Doc. 40-9 at 5)).  And, although Dr. Baaj recommended at the July 26 follow up that x-rays and imagings "be performed immediately" and the results mailed to him, the imagings were not done until October 2013 (*id.* at 12 (Doc. 40-9 at 12); Doc. 33, DSOF ¶ 12).  Also, Dr. Baaj recommended pain management post surgery

1    (Doc. 40-1 at 10), and one post-surgical note documenting pain management

2    recommendations states "f/u [with] outpatient chronic pain MD" (*id.* at 25 (Jan. 3, 2013

3    post-op pain management consult med. record)), which, when making all inferences in

4    Larsgard's favor, supports that follow up with a pain management physician or specialist

5    was recommended.   Even assuming that a specialist in pain management was not

6    recommended, as Corizon argues, its own asserted facts show that the first pain

7    management appointment or "discussion" was not until August 20, 2013 with Nurse

8    Practitioner Unger (Doc. 33, DSOF ¶ 9).

9        In light of these substantial delays in following the treating specialist's

10   recommendations, there are material factual disputes whether, in 2013, medical staff was

11   deliberately indifferent to Larsgard's serious medical needs following his surgery.  But,

12   as stated, even if deliberate indifference is shown, to maintain his Eighth Amendment

13   claim, Larsgard must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at

14   1096.

15       At his March 10, 2014 follow up appointment, Dr. Baaj noted that Larsgard's pain

16   was improved and he had good alignment, no hardware complications, and full range of

17   motion in his neck without pain (Doc. 33, Ex. Q (Doc. 33-1 at 37)).   Larsgard

18   acknowledges that despite the delays, he did not suffer complications post surgery, which

19   he attributes to Dr. Baaj and the hospital staff (Doc. 39 at 11).  But the infliction of pain

20   can constitute an Eighth Amendment violation even if a delay in treatment does not

21   impact further treatment.  *See McGuckin*, 974 F.2d at 1060.  Larsgard avers that upon his

22   release from the rehabilitation center in February 2013, his pain control was "very good"

23   due to the combination of medications he was receiving (Doc. 40, Ex. 8, Larsgard Decl.

24   ¶¶ 2-3 (Doc. 40-8 at 1)).  He states that in June 2013, his Clonazepam was discontinued

25   and he began suffering severe muscle spasms that prevented sleep for more than a couple

26   of hours at a time for several weeks until he was prescribed diazepam (*id.* ¶ 6).  At his

27   July 26, 2013 appointment with Dr. Baaj, Larsgard had progressive weakness and

28   increasing pain in his neck that prevented sleep for more than an hour at a time (Doc. 13-

- 14 -

1 at 14).  But at his August 20, 2013 appointment with the Nurse Practitioner, Larsgard reported that his pain was manageable (Doc. 33, DSOF ¶ 9; Doc. 40, PCSF ¶ 9).  And Larsgard declared that prior to his transfer to Yuma in March 2014, his "level of pain control had been acceptable for most of the day," although there were 2-3 hours gaps between his morphine doses when pain control was inadequate and the diazepam dosage was too low to entirely control muscle spasms (*id.* ¶ 7).

These facts demonstrate that there was a period in June-July 2013 when changes to Larsgard's medication resulted in increased muscle spasms and increased neck pain; however, Larsgard's own averments establish that before he moved to the Yuma facility in March 2014, his pain was, for the most part, manageable.  Consequently, although the record supports a material factual dispute whether medical personnel were deliberately indifferent to Larsgard's serious medical needs after surgery when they delayed treatment recommended by Dr. Baaj, because Larsgard cannot show that he suffered harm as a result, his Eighth Amendment claim fails as to his past treatment.

### b. Current Treatment

To maintain his Eighth Amendment claim for injunctive relief—specifically, his request for specialist care for pain management—Larsgard must show that he is currently subject to deliberately indifferent treatment and that he is suffering ongoing harm as a result.  *See Farmer*, 511 U.S. at 846.

Corizon asserts that since Dr. Baaj released Larsgard from further follow up care, it began transitioning Larsgard to non-narcotic medications for his own health and well-being (Doc. 32 at 12).  In support of its claim that this course of treatment is adequate, Corizon proffers the March 20, 2014 expert opinion of Dr. William R. Stevens, a board certified orthopedic surgeon, who reviewed Larsgard's medical records (Doc. 33, Ex. Z (Doc. 33-1 at 74-75)).  Dr. Stevens opines that Larsgard's current pain medication regimen is more than adequate for his condition and that "pain management consultation might be medically reasonable"; however, it is "not medically imperative unless" efforts to taper the opioid medications prove unsuccessful (*id.*).  Corizon also asserts that it

referred Larsgard to a pain specialist, Dr. Ladin, on June 3, 2014,[9] and Dr. Ladin agreed that Larsgard should be weaned off opioid or narcotic pain medications (Doc. 41 at 4). Corizon maintains that it is now following Dr. Ladin's recommendations; thus, Larsgard cannot show that the current course of treatment is medically unacceptable (Doc. 41 at 4, 6).

In response, Larsgard contends that Corizon's staff is not qualified to address his complicated medical needs (Doc. 39 at 7, 11). In his declaration, Larsgard states that since he arrived in Yuma in March 2014, his morphine dosages have not been provided and he has been given various ineffective medications (Doc. 40, Ex. 8, Larsgard Decl. ¶ 9 (Doc. 40-8 at 2)). The record shows that some medications provided to Larsgard caused potentially harmful side effects, including hypoglycemia and tachycardia issues, which required replacement medications (Doc. 33, DSOF ¶¶ 20-21).

Larsgard also contends that his pain is currently not manageable. At the time of his declaration—May 31, 2014—Larsgard reported severe pain that prevents him from sleeping more than 10 minutes at a time and interferes with most daily activities (Doc. 40, Ex. 8 ¶ 10). At his June 3, 2014 appointment, Larsgard reported ongoing, severe pain in his neck, left shoulder, and upper arm, and he stated that the pain is sharp, stabbing, and aching in quality (*id.*, Ex. 6 (Doc. 40-6 at 3)). He further reported that his pain is only partially relieved with MS Contin and that nothing else has helped (*id.*). The Court also notes Dr. Ladin's June 2014 diagnosis that Larsgard suffered significant nerve

---

[9] The Court notes that although Corizon referred Larsgard to a pain specialist on June 3, 2014, Corizon makes no argument that the request for an injunction for pain management specialist care is moot (*see* Doc. 41 at 2, 4). Instead, Corizon argues that specialist care for pain management is not required and that pain management provided by its licensed health staff is medically appropriate (*see* Doc. 32 at 3, 9, 11-12; Doc. 41 at 1-2; Doc. 42 ¶ 2). Further, Dr. Ladin stated in his report he was asked to serve as a consultant specifically to comment on whether Larsgard requires MS Contin and diazepam (Doc. 40-6 at 6). And, as stated, Corizon argues that Dr. Ladin's separate declaration is improper and lacks foundation because it contains "no statement as to whether the nature of care Dr. Ladin is now recommending is relevant to now or some, if any, times in the past" (Doc. 41 at 4). Corizon's arguments suggest that Dr. Ladin's consult was limited in scope and does not represent that specialist care will be provided in the future; therefore, the Court finds that the June 3, 2014 appointment with Dr. Ladin does not moot Larsgard's request for pain management specialist care.

1    damage and has legitimate pain syndrome and components of both nociceptive and

2    neuropathic pain (Doc. 40, Ex. 6 at 6 (Doc. 40-6 at 6)).  The inference from this evidence

3    is that Larsgard is currently suffering harm.

4         With respect to the need for specialist care, Larsgard submits his own expert

5    opinion, that of Dr. Harvinder S. Bedi, an orthopedic spine surgeon, who reviewed

6    Larsgard's medical records in February 2014 (Doc. 39 at 7, 11; Doc. 40, Ex. 16 (Doc. 40-

7    16 at 1-2)).  Dr. Bede opined that it is imperative Larsgard obtain treatment from a

8    qualified pain management specialist due to his chronic high dose pain medication

9    requirement (Doc. 40-16 at 1-2).  Larsgard also relies on Dr. Ladin's opinion that it is

10   medically necessary for Larsgard to be treated by a pain management specialist with

11   experience in spinal cord care and that a nurse practitioner or general practitioner

12   providing pain management is inappropriate given Larsgard's complex condition (Doc.

13   40, Ex. 7, Ladin Decl. ¶¶ 3-4 (Doc. 40-7 at 1-2)).  The Court notes that unlike Drs.

14   Stevens and Bedi, who only reviewed Larsgard's medical records, Dr. Ladin reviewed

15   the medical records *and* conducted an in-person interview and physical examination of

16   Larsgard (Doc. 33-1 at 74; Doc. 40-16 at 1; Doc. 40-6 at 1-6).  *See Snow*, 681 F.3d at

17   987-88 (noting that the physicians who denied recommended surgery for the prisoner had

18   not examined or treated the prisoner).

19        On Corizon's motion, the Court must make all inferences in Larsgard's favor.

20   *Anderson*, 477 U.S. at 255.  When doing so, Drs. Bedi and Ladin's opinions support the

21   inference that pain management care by a specialist is medically necessary.  At summary

22   judgment, the opinion of Corizon's expert, Dr. Stevens, does not overcome this inference.

23   *See Snow*, 681 F.3d at 988, 992 (finding that the district court improperly concluded that

24   there was a mere disagreement of medical opinion and, in doing so, failed to identify the

25   triable issues of fact whether the defendants delayed appropriate medical treatment or

26   whether their course of treatment was medically unacceptable).  Because the denial of

27   medically necessary treatment constitutes deliberate indifference, *see Estelle*, 429 U.S. at

28   104-05, there exists a triable issue of fact concerning whether Corizon's course of

1    treating Larsgard's current pain needs with non-specialist medical personnel is
2    "medically unacceptable under the circumstances" and chosen "in conscious disregard of
3    an excessive risk to [Largard's] health."  *See Jackson*, 90 F.3d at 332.

4                   **B.    Policy or Custom Amounting to Deliberate Indifference**

5              As discussed above, whether there is a constitutional violation—in this case,
6    deliberate indifference to serious medical needs—is the first of four elements to be
7    considered when determining whether an entity is liable under § 1983.  Because there is a
8    material factual dispute on that first element, the Court must consider whether Corizon
9    had a policy or custom and, if so, whether that policy or custom amounted to deliberate
10   indifference and was the moving force behind the constitutional violation.  *Mabe*, 237
11   F.3d at 1110-11; s*ee Tsao*, 698 F.3d at 1139 (private entity liable under § 1983 only if
12   constitutional violation caused by a policy).

13             Corizon does not present any argument regarding the policy requirement, nor does
14   it show that Larsgard lacks evidence to support this element of his claim.  *See Nissan*,
15   210 F.3d at 1102.  In his declaration, Larsgard makes a few allegations regarding a policy
16   (*see* Doc. 40, Ex. 8, Larsgard Decl. ¶¶ 4, 19 (Doc. 40-8 at 1, 3); Doc. 43, Ex. 1, Larsgard
17   Supp. Decl. ¶¶ 4-5 (Doc. 43-2 at 1-2)); however, he was not on notice that he must
18   present facts and evidence of a policy or custom that amounted to deliberate indifference.
19   *See Katz v. Children's Hosp. of Orange Cnty.*, 28 F.3d 1520, 1534 (9th Cir. 1994) (the
20   nonmovant fails to satisfy its burden to show that there is a genuine issue for trial only if
21   the movant has placed it on proper notice); *Evans v. United Air Lines, Inc.*, 986 F.2d 942,
22   945 (5th Cir. 1993) (where the defendant's summary judgment motion did not address
23   many of the plaintiffs' claims, the plaintiffs were not on notice as to those claims).
24   Accordingly, Corizon fails to meet its initial summary judgment burden on this portion of
25   Larsgard's claim.

26             In light of the material factual dispute regarding whether there is deliberate
27   indifference to Larsgard's current serious medical need, the Motion for Summary
28   Judgment will be denied.

**V.      New Summary Judgment Motion Deadline**

A district court may enter summary judgment on grounds not raised by a party if it gives notice and a reasonable time to respond.  Fed. R. Civ. P. 56(f)(2).  In this case, evidence and briefing regarding whether there exists a policy or custom and whether that policy or custom amounts to deliberate indifference could be dispositive of the Eighth Amendment claim and should be considered before trial.  The Court will therefore permit Corizon to file a new summary judgment motion addressing the remaining elements for a § 1983 claim against an entity; specifically, (1) whether Corizon has a policy or custom; (2) whether the policy or custom amounts to deliberate indifference to Larsgard's constitutional right; and (3) whether the policy or custom was the moving force behind the constitutional violation.  *Mabe*, 237 F.3d at 1110-11; *see Hoffman v. Tonnemacher*, 593 F.3d 908, 911-12 (9th Cir. 2010) (a district court has discretion to permit successive motions for summary judgment).

Any new summary judgment motion is limited to these three factors; the Court will not consider any arguments pertaining to deliberate indifference, which has already been addressed.  Further, because Corizon did not move for summary judgment on the state-law claim before the original dispositive-motions deadline, the Court will not consider any arguments for summary judgment on Count II (*see* Doc. 12, setting June 2, 2014 deadline).

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant Corizon's Motion for Summary Judgment (Doc. 32).

//

//

//

//

//

//

- 19 -

1    (2) Defendant Corizon's Motion for Summary Judgment (Doc. 32) is **denied.**

2    (3) Within **30 days** from the date of this Order, Defendant Corizon may file a new

3    summary judgment motion limited to the issues outlined in this Order.

4    Dated this 21st day of October, 2014.

5

6    _____
     Honorable Steven P. Logan

7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28